UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. CR-21-60-CBG |
| | ) |
| TYLER JAY MULLINS, | ) |
| | ) |
|     Defendant. | ) |

# ORDER

Now before the Court is a Motion to Suppress (Doc. No. 82) and a Motion in Limine (Doc. No. 80), filed through counsel by Defendant Tyler Jay Mullins. The Government has filed an omnibus Response in opposition (Doc. No. 93) addressing each of the pretrial motions filed by Defendant.

On February 8, 2022, the Court conducted an evidentiary hearing. Defendant appeared personally and through counsel, Kevin D. Adams and Robert D. Gifford II. The Government appeared through Assistant United States Attorneys Patrick M. Flanigan and Gregory Dean Burris. The Court heard argument from counsel, as well as the testimony of Chris Ross, Frank Stout, and Defendant.[1]

In his Motion to Suppress, Defendant requests suppression of "any statements by Defendant Tyler Jay Mullins, and evidence obtained thereafter, subject to plea negotiations, unlawful disclosure of privileged statements and the poisoned fruits thereof,

---

[1] The Court finds that the testimony of these witnesses is credible as to the portions relied upon herein.

or in the alternative for ineffective assistance of counsel should be suppressed." Def.'s Mot. to Suppress at 10. After the presentation of evidence at the hearing, Defendant's counsel expressly withdrew Defendant's argument that suppression was required on the basis of ineffective assistance of counsel in violation of the Sixth Amendment, leaving for the Court's determination whether the evidence that the Government intends to offer at trial are subject to exclusion under Federal Rule of Evidence 410(a)(4) or based upon attorney-client privilege. Upon consideration of the evidence and the parties' arguments, the Court makes its determination.

### I.   *Background*

In the early morning hours of Saturday, April 20, 2002, Rachel Woodall disappeared. Ms. Woodall's ex-boyfriend, Defendant Tyler Jay ("T.J.") Mullins was immediately suspected of wrongdoing. Ms. Woodall's neighbor had spotted Defendant looking through Ms. Woodall's car at around 3:30 a.m. the morning Ms. Woodall disappeared. Later that same morning, Defendant made allegedly unusual phone calls to Ms. Woodall's mother and new boyfriend, prompting suspicion. Additionally, when police contacted Defendant, they noted he had multiple injuries that the officers believed were inconsistent with Defendant's claim that he was attacked by two unknown men.

Based on these factors, Detective Hood of the Ada Police Department went to Defendant's residence at approximately 1:00 p.m. on April 20, 2002. Detective Hood spoke with Defendant, who repeated the story of being attacked by two men in the early morning hours of April 20, 2002. After conferring with Detective Captain Crosby, Detective Hood went to Defendant's residence and asked Defendant if he would come to

the police department to speak with Captain Crosby. Defendant agreed. Captain Crosby and Detective Hood[2] interviewed Defendant.

Attorney Frank Stout testified that after Defendant went to the police department for questioning, Defendant's uncle, Harry Jordan,[3] retained Stout to represent Defendant. After Stout arrived at the police department, police ceased questioning Defendant and Stout conferred with him.

At some point on April 20, 2002, Stout and Pontotoc County Assistant District Attorney Chris Ross engaged in a conversation regarding the recovery of Ms. Woodall's body.[4] There is disagreement regarding what exactly was said by whom. Stout testified that ADA Ross suggested that if Defendant disclosed the location of Ms. Woodall's body, the State would not seek the death penalty. ADA Ross testified that Stout had approached him to inquire about whether the State would decline to seek the death penalty in exchange for Defendant disclosing the location of Ms. Woodall's body, but Ross never attempted to "make a deal" over the body. Defendant testified that his understanding was that if Defendant led police to Ms. Woodall's body, he would get "a lighter sentence." For the purpose of evaluating Defendant's Motion to Suppress, the Court will assume that Stout's version of events is true.

ADA Ross testified that on Sunday, April 21, 2002, Defendant's uncle, Harry

---

[2] Captain Crosby and Detective Hood are now deceased.

[3] Harry Jordan is now deceased.

[4] ADA Ross' testimony suggests that at the time of this conversation, ADA Ross believed Defendant had killed Ms. Woodall.

3

Jordan, who was previously acquainted with ADA Ross, talked to ADA Ross on the phone and asked what he thought he would be doing with Defendant. ADA Ross testified that he made no promises to Mr. Jordan but expressed that "the worst [he] could do was ask for the death penalty." ADA Ross states he made clear to Mr. Jordan that ADA Ross could not tell Mr. Jordan what would happen to Defendant because ADA Ross did not know what had happened to Ms. Woodall.

Later that afternoon, Stout informed police that Defendant was willing to take them to Ms. Woodall's body. Law enforcement officers from various agencies formed a caravan and drove to the site of the body. Stout testified that he and Defendant rode in a bus with Crosby and several other law enforcement officers, and ADA Ross testified that he drove at the rear of the caravan in his personal vehicle.

The caravan stopped at a "gravel or rock pit." ADA Ross testified that after searching for a while OSBI agent Gary Perkinson discovered Ms. Woodall's body wrapped in a blue tarp and buried under gravel. Upon discovery of the body, Iris Dalley of the OSBI examined and photographed the scene. ADA Ross testified that as they waited for the medical examiner to arrive, Stout told ADA Ross an "unofficial version" of what Defendant had done to Ms. Woodall. Stout denies that this conversation took place.

The next day, April 22, 2002, Defendant was charged in the District Court of Pontotoc County with the first-degree murder of Rachel Woodall. One month later, on May 22, 2002, Stout withdrew as Defendant's attorney. On December 30, 2002, Defendant entered a "blind" guilty plea, and on February 13, 2003, Defendant was sentenced to life in prison without the possibility of parole. On August 4, 2020, Defendant filed an

application for Post-Conviction Relief citing the Supreme Court's ruling in *McGirt v. Oklahoma,* 140 S. Ct. 2452 (2021).  The Pontotoc County District Court granted the application and vacated Defendant's state conviction and sentence.

The United States Attorney's Office for the Eastern District of Oklahoma is now prosecuting Defendant for the 2002 killing of Rachel Woodall.  Defendant is charged in a Superseding Indictment with: (1) Murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153; and (2) Causing the Death and Murder of a Person in the Course of a Violation of Title 18 U.S.C. § 924(c), in violation of 18 U.S.C. § 924(j)(1).  *See* Superseding Indictment (Doc. No. 45).  The matter is currently set for trial on the Court's June 2022 jury trial docket.

In his Motion to Suppress, Defendant requests suppression of "any statements by Defendant Tyler Jay Mullins, and evidence obtained thereafter, subject to plea negotiations, unlawful disclosure of privileged statements and the poisoned fruits thereof." Def.'s Mot. to Suppress at 10.  Additionally, Defendant requests that the Government be prohibited from introducing privileged communications between Stout and Defendant and "having any conversations with Mr. Stout without permission from Mr. Mullins." Def.'s Mot. in Limine at 3.

At the suppression hearing, the parties identified the following potential evidence as implicated by Defendant's Motion:

1) testimony of Stout regarding Defendant's provision of directions to Ms. Woodall's body;
2) testimony of Iris Dalley of the OSBI regarding what she observed at the site of the body on April 21, 2002;

5

3) photographs taken by Iris Dalley at the site of the body on April 21, 2002

4) testimony of Gary Perkinson of the OSBI regarding what he observed at the site of the body on April 21, 2002;

5) shell casings and a discharged bullet recovered by Gary Perkinson from the site of the body on April 22, 2002;

6) photographs of the site of the body taken by Gary Perkinson on April 22, 2002;

7) the Medical Examiner's evaluation and report;[5]

8) autopsy photos of Ms. Woodall's body; and

9) the testimony of FBI Special Agent Craig Overby regarding a 2003 in-custody statement by Defendant.

## II. Relevant Standards

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation" of the defendant's constitutional rights. *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261-62 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982)). "The proponent of a motion to suppress bears the burden of proof." *United States v. Moore,* 22 F.3d 241, 243 (10th Cir. 1994). "The controlling burden of proof at a suppression hearing is proof by a preponderance of the evidence." *Maurek*, 131 F. Supp. 3d at 1262. Further, when a defendant seeks to suppress the fruits of a constitutional violation, the defendant "has the initial burden of establishing a causal connection between [the constitutional violation] and the evidence he seeks to suppress." *United States v. Shrum,* 908 F.3d 1219,

---

[5] The Government states it anticipates that it will remove the portions of the Medical Examiner's Report containing statements by Defendant before presenting the Report at trial.

1233 (10th Cir. 2018). "Specifically, the defendant must establish the incriminating evidence 'would not have come to light *but for* the [constitutional violation].'" *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

"A motion *in limine* is a request for guidance by the court regarding an evidentiary question, which the court may provide at its discretion to aid the parties in formulating trial strategy." *Jones v. Stotts,* 59 F.3d 143, 146 (10th Cir. 1995) (internal quotation marks omitted). Generally, the proponent of a motion in limine bears the burden of proof. *See e.g., First Sav. Bank v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1082 (D. Kan. 2000); *Pinon Sun Condo. Ass'n, Inc. v. Atain Specialty Ins. Co.*, No. 17-cv-01595, 2020 WL 1452166, at *3 (D. Colo. Mar. 25, 2020). "A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed." *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999).

### III. *Defendant's Motion to Suppress*

#### A. *Privileged Communications*

Initially, Defendant argued that Stout violated attorney-client privilege by disclosing the content of privileged communications between Stout and Defendant to ADA Ross in two separate conversations. Def.'s Mot. to Suppress at 7. At the hearing, however, the Government stated that it does not intend to introduce evidence of those two conversations at trial.

The evidence that the Government intends to offer through Stout—testimony by Stout that Defendant led police to Ms. Woodall's body—does not implicate privileged communications. Stout testified that Defendant himself provided directions to police.

7

Communications made in the presence of a third party or disclosure of a privileged communication to a third party waives attorney-client privilege as to that communication. *See In re Grand Jury Proc.*, 616 F.3d 1172, 1184 (10th Cir. 2010) ("Because confidentiality is the key to maintaining the attorney-client privilege, a party waives the privilege when he voluntarily discloses to a third party material or information that he later claims is protected."). For these reasons, the portion of Defendant's Motion seeking to suppress allegedly privileged communications is denied.

### B. Plea Discussions

Defendant argues that "any statements by Defendant Tyler Jay Mullins, and evidence obtained thereafter, subject to plea negotiations . . . should be suppressed." Def.'s Mot. to Suppress at 10. Defendant further contends that the nine items of evidence listed above should be suppressed under Rule 410(a)(4) of the Federal Rules of Evidence as either statements made during plea discussions or evidence derived from such plea discussions.

Federal Rule of Evidence 410(a)(4) prohibits admission of evidence against a defendant of "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions . . . resulted in a later-withdrawn guilty plea."[6] Fed. R. Evid.

---

[6] In *United States v. Magnan,* 622 F. App'x 719 (10th Cir. 2015), the Tenth Circuit held that, while Rule 410(a) does not apply to all vacated convictions, "if a trial court is held to have lacked jurisdiction, a plea entered before it is invalidated" and "must be treated as 'withdrawn'" under that Rule. *Id.* at 724; *see also* Fed. R. Evid. 410(a)(1), (3); Def.'s First Mot. in Limine (Doc. No. 32) at 4. This ruling would indicate that Defendant's now-vacated state-court guilty plea must likewise be treated as "later-withdrawn" under Rule 410(a)(4). Accordingly, evidence of any statements made during plea discussions that resulted in that plea would be inadmissible against Defendant pursuant to Rule 410(a)(4). The statements and evidence that the Government seeks to introduce at trial, however, are not "plea discussions" subject to Rule 410(a)(4).

410(a)(4); *see also* Fed. R. Crim. P. 11(f) ("The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410.").

The Government argues that the Rule does not exclude evidence "derived" from plea discussions and, in any event, that ADA Ross never engaged in plea discussions with Defendant, his attorney Stout, or his uncle Jordan, and so Rule 410(a)(4) does not apply to the evidence at issue. *See* Gov't Omnibus Resp. at 11-12. Further, the Government contends that Defendant provided the directions to law enforcement, not to an attorney for the State, as required for exclusion by Rule 410(a)(4). *See id.*

  i. *Statements to Law Enforcement*

At the hearing, Defendant argued that Federal Rule of Evidence 410(a)(4) extends to exclude Defendant's statements to law enforcement officials made outside of ADA Ross' or other prosecutors' presence.

As a threshold matter, such statements would not have been made to "an attorney for the prosecuting authority" as expressly required for exclusion under Rule 410(a)(4). Fed. R. Evid. 410(a)(4). The District Court for the Northern District of Oklahoma has declined to consider statements made to law enforcement as statements made during "plea discussions" under Rule 410(a)(4), no matter the defendant's subjective expectation. The Court finds these decisions persuasive in the instant matter. *See, e.g.*, *United States v. Williams,* No. 04-CR-167, 2005 WL 8160648, at *1 (N.D. Okla. Oct. 21, 2005) ("[S]tatements made in connection with plea negotiations involve, at a minimum, discussion with an attorney for the prosecuting authority. Exclusion of Williams'

9

statements to law enforcement personnel is therefore inappropriate."); *United States v. Thompson*, No. 07-CR-0008, 2007 WL 613990, at *1 (N.D. Okla. Feb. 22, 2007) ("[D]efendant in this case spoke with law enforcement officials who did not have the authority to negotiate plea agreements. There is no reason to believe that, even expanding the plain language of Fed. R. Evid. 410, defendant's subjective beliefs affect the admissibility of his statements.").[7]

There is authority suggesting that a defendant's conversation with law enforcement agents could nevertheless constitute a plea discussion under Rule 410(a)(4) if (1) "'the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion'" and (2) "'the accused's expectation was reasonable given the totality of the objective circumstances.'" *See United States v. Williams,* No. 08-CR-21, 2008 WL 1732954, at *4 (N.D. Okla. Apr. 10, 2008) (quoting *United States v. Robertson,* 582 F.2d 1356, 1366 (5th Cir. 1978)); *see also United States v. Browning*, 252 F.3d 1153, 1158 (10th Cir. 2001). Further, the Eighth Circuit has held that the former Federal Rule of Criminal Procedure 11(e)(6)(D) "cover[ed] plea discussions with law enforcement officials 'with *express* authority from a government attorney' to conduct plea negotiations." *Browning*,

---

[7] Federal Rule of Evidence 410(a)(4) "limit[s] protection to statements made in connection with discussions with a prosecutor, on the rationale that discussions between law enforcement and defendants do not involve the sort of negotiations that should be encouraged by exclusion of admissions made during those negotiations." 1 *McCormick on Evidence* § 160 (8th ed.) (noting that "generally no protection is afforded to statements made to law enforcement officers").

10

252 F.3d at 1158 (quoting *United States v. Lawrence*, 952 F.2d 1034, 1037 (8th Cir. 1992)).[8]

Defendant has not presented facts to support the application of either of these exceptions. Relevant to the Eighth Circuit's broader application of Rule 410(a)(4), there is no evidence here suggesting that ADA Ross had authorized police officials to make a plea agreement with Defendant on behalf of the State. Nor is there any apparent basis for Defendant to have had a reasonable, subjective expectation to negotiate a plea when he made statements to law enforcement agents concerning directions to the site of the body. The hearing testimony suggests that on April 20, 2002, Stout and ADA Ross had a discussion concerning the State declining to seek the death penalty if Defendant led police to Ms. Woodall's body. Consequently, it appears that on April 21, 2002, Stout was aware that ADA Ross was the official with whom to negotiate any plea deal, not Captain Crosby or other law enforcement agents. Stout was with Defendant when Defendant rode on the bus to the site of the body, providing law enforcement agents directions to that site. ADA Ross did not ride the bus with Defendant, Stout, and law enforcement, but rather followed behind in his personal vehicle. Therefore, "[w]ithout the presence of an attorney authorized to enter plea negotiations" on behalf of the State, "[D]efendant's subjective expectation to negotiate a plea bargain [with law enforcement officials] was unreasonable." *Williams*,

---

[8] Prior to 2002, Rule 11(e)(6)(D), as well as Rule 410(a)(4), prohibited "admission of 'any statements made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty.'" *Browning,* 252 F.3d at 1158 (quoting Fed. R. Crim. P. 11(e)(6)(D)). The Tenth Circuit's reasoning in *Browning* remains relevant when considering whether a statement was "made during plea discussions" under Rule 410(a)(4). *Thompson*, 2007 WL 613990, at *1 & n.1.

2008 WL 1732954, at *5 (citing *United States v. Stein*, No. 04-269-9, 2005 WL 1377851, at *10 (E.D. Pa. June 8, 2005)).

Therefore, assuming without deciding that the conversation between Stout and ADA Ross on April 20, 2002, was a plea discussion under Rule 410(a)(4), the subsequent statements that Defendant made to law enforcement on April 21, 2002, regarding directions to the site of the body, were not "made during plea discussions" and therefore are not subject to exclusion under Rule 410(a)(4).

### ii. *Evidence Derived from Plea Discussions*

Defendant argues that Fed. R. Evid. 410(a)(4) extends not just to the alleged plea discussions between ADA Ross and Stout and between Ross and Jordan, but to all evidence derived from those discussions, such as Defendant's statements to police regarding the location of Ms. Woodall's body, the testimony of those present at the site of the body, the photos of Ms. Woodall's body taken at the site, the shell casings and bullet recovered from the site, and the Medical Examiner's report. Defendant, however, provides no authority to support a finding that Rule 410(a)(4) is so far reaching. To the contrary, Rule 410(a)(4)'s plain language "[applies] only to 'statements' made in the course of plea discussions and contain no restrictions on the use of any evidence derived from those statements." *Stein*, 2005 WL 1377851, at *14 (declining to suppress derivative evidence that the government had obtained in reliance on statements made in a plea agreement proffer).

> Neither the language nor the legislative history of these statutes shows any evidence that Congress ever contemplated, much less intended, that FRE 410 and FRCrP 11(f) would apply to derivative evidence. . . . .
>
> . . . .

> Every federal court to have considered the issue has similarly found that FRE 410 and FRCrP 11(f) do not require suppression of derivative evidence. [*United States v. Rutkowski*, 814 F.2d 594, 598-99 (11th Cir. 1987)]; *United States v. Cusack*, 827 F.2d 696, 697-98 (11th Cir. 1987); *United States v. Millard*, 235 F.3d 1119, 1120 (8th Cir. 2000); [*United States v. Fronk*, 173 F.R.D. 59, 62 (W.D.N.Y. Apr. 9, 1997)]; *but see United States v. Ankeny*, 30 M.J. 10, 14-15 (C.M.A. 1990) (holding substantively identical provision of the Military Code of Evidence, Mil. R. Evid. 410 should be "broadly construe[d]" to require the suppression of derivative evidence in order "to encourage plea negotiations"); *Weinstein's Federal Evidence* § 410.09[4] (Joseph M. McLaughlin, ed. 2d ed. 2005) ("It would seem that, to enforce the policy underlying Rule 410, the better approach would be to import the 'fruit of the poisonous tree' doctrine into this area.").
>
> FRE 410 and FRCrP 11(f) represent a balance struck by Congress between the rules' beneficial purpose of encouraging "the unrestrained candor which produces effective plea discussions" (1979 Advisory Committee Notes) and the countervailing cost of excluding probative evidence from the trier of fact. Altering that balance by extending the reach of the rules to derivative evidence would impose significant additional costs upon the government and the courts, including the burden of determining whether any evidence discovered after plea negotiations had begun was the inadmissible "fruit" of those negotiations. *See, e.g.*, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).
>
> It is for Congress, not this Court, to weigh those competing costs and benefits. Accordingly, this Court will decline to go beyond the plain language of FRE 410 and FRCrP 11(f) and will not extend those rules to require the suppression of derivative evidence.

*Id.* at *14-15.

Therefore, assuming without deciding that plea discussions did take place, the Court disagrees that evidence allegedly derived from such plea discussions is subject to exclusion under Defendant's expansive view of Federal Rule of Evidence 410(a)(4).

### C. The State's Communications with Defendant's Family Members

Harry Jordan is now deceased and the Government has stated it does not intend to call ADA Ross as a trial witness. Therefore, it appears that the Government has no

available avenue through which to introduce statements made during discussions between ADA Ross and Jordan.  This appears to moot any argument for exclusion of evidence of such discussions.

Further, to the extent Defendant argues that the discussions between ADA Ross and Jordan rendered the directions Defendant provided to police an involuntary confession obtained in violation of the Fourteenth Amendment, such an argument is unavailing.  The fact that ADA Ross told Jordan that "the worst [he] could do was ask for the death penalty" is not enough by itself to render a subsequent confession involuntary.  *See United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994) ("[D]iscussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice."); *see also Parker v. North Carolina*, 397 U.S. 790, 795 (1970) ("[A]n otherwise valid plea is not involuntary because induced by the defendant's desire to limit the possible maximum penalty to less than that authorized if there is a jury trial.").  Here, Defendant's decision to disclose the location of Ms. Woodall's body was according to Defendant the result of plea discussions, or according to the Government a unilateral attempt by Defendant to avoid the death penalty.  Under either interpretation of events, the directions Defendant provided were not a product of overborne will and so were not involuntary.  Therefore, ADA Ross' communications with Harry Jordan do not require the exclusion or suppression of Defendant's subsequent cooperation with police or evidence derived from

that cooperation.

*IV. Defendant's Motion in Limine*

Defendant's Motion in Limine seeks to prevent the Government from obtaining attorney-client privileged communications from Stout, to exclude the introduction of privileged statements through Stout, and to prohibit the Government from having any conversations with Stout without first obtaining Defendant's permission. *See* Def.'s Mot. in Limine at 3-4. As stated above, the Government has informed the Court that it does not intend to elicit testimony from Stout at trial regarding privileged communications. Rather, the Government intends to ask questions regarding Defendant's provision of directions to the site of the body. This subject does not implicate privileged communications, as set forth above. Additionally, Stout testified that the Government has not attempted to initiate conversations with him other than by calling him to confirm that he would be present at the suppression hearing.

Therefore, based on the Government's representations and Stout's testimony, the Court denies Defendant's Motion in Limine.

## CONCLUSION

For the reasons outlined above, Defendant's Motion in Limine (Doc. No. 80) and Motion to Suppress (Doc. No. 82) are DENIED.

IT IS SO ORDERED this 27th day of June, 2022.

_____
CHARLES B. GOODWIN
United States District Judge