**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. CR-21-60-CBG |
| | ) | |
| TYLER JAY MULLINS, | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

Now before the Court is the Government's Motion in Limine (Doc. No. 124), seeking to exclude evidence of law enforcement corruption in Pontotoc County in the years preceding the events of this case. Defendant has responded in opposition. Doc. No. 130. On June 10, 2022, the Court held a hearing on this matter and heard argument from both parties. Having heard the parties' arguments and reviewed the filings, the Government's Motion in Limine is GRANTED IN PART and DENIED IN PART.

*I.      Background*

On March 17, 2021, Defendant's state-court conviction for the first-degree murder of Rachel Woodall was vacated by order of the trial court pursuant to *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). Now, Defendant stands charged in a Superseding Indictment in this Court for Ms. Woodall's murder. Specifically, Defendant is charged with: (1) Murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153; and (2) Causing the Death and Murder of a Person in the Course of a Violation of Title 18 U.S.C. § 924(c), in violation of 18 U.S.C. § 924(j)(1). *See* Superseding Indictment (Doc. No. 45).

Jeff Crosby and Kevin Hood[1] were detectives with the Ada Police Department who investigated Defendant in 2002 for Ms. Woodall's murder. *See* Gov't's Mot. at 1. Ms. Woodall was reported missing on the morning of April 20, 2002, and her ex-boyfriend, Defendant, was immediately identified as a suspect. *See id.* At the hearing, the Government represented that Defendant made unusual phone calls to Ms. Woodall's friends and family the morning she disappeared asking about Ms. Woodall's whereabouts. Additionally, a police officer who made contact with Defendant the morning of April 20th observed injuries on Defendant's body that were inconsistent with Defendant's contention that he had been in a fight with two men the night before. *See id.* at 2.

That afternoon, Defendant agreed to be interviewed at the Ada Police Station regarding Ms. Woodall's disappearance. *See id.* After being interviewed by Crosby and Hood, Defendant was booked into jail on a state charge of first-degree murder. *See id.* at 6. The next day, Defendant led authorities to the site of Ms. Woodall's body, which was in a remote location in a neighboring county. *See id.* Defendant eventually pled guilty in the District Court of Pontotoc County to the charge of first-degree murder and was sentenced to life in prison without the possibility of parole.[2] *See id.* at 3.

---

[1] Crosby and Hood are both now deceased. At the time of the investigation, Crosby had the rank of Detective Captain. *See* Def.'s Resp. at 2. As discussed below, it is generally believed that Crosby's death in 2018 was caused by suicide. *See* Gov't's Mot. at 3.

[2] At the June 10, 2022 hearing, defense counsel represented that Defendant only pled guilty after his mother went to him and begged him to plead guilty for fear that Defendant would receive the death penalty if he proceeded to trial. Defense counsel also stated that Defendant attempted to withdraw his plea, but his motion was denied on procedural grounds.

Defendant argues that in the years leading up to Defendant's arrest, law enforcement in Pontotoc County had a reputation for corruption, and Defendant's knowledge of this corruption caused Defendant to cover up Ms. Woodall's killing, which he characterizes as done either in self-defense or the heat of passion, out of fear he would be treated unfairly. *See* Def.'s Resp. at 4-6. Specifically, Defendant contends that the Ada Police Department's former Deputy Chief, Dennis Corvin, was convicted and sentenced to prison on federal drug charges less than six months before Defendant's arrest. *See id*. at 4-5. Also, three years before Defendant's arrest, in a highly-publicized case Ron Williamson and Dennis Fritz were exonerated upon re-trial when DNA evidence proved they did not commit the homicide of which they were originally convicted. *See id*. at 5. Defendant stresses that Mr. Williamson, like Defendant, was Native American.

In 2003, the Federal Bureau of Investigation investigated allegations of misconduct and corruption by the Ada Police Department, specifically involving Crosby, that were unrelated to the death of Rachel Woodall or investigation of that death. *See id.* at 2. Special Agent Craig Overby interviewed Defendant as a potential witness to police corruption in Ada. Defendant recounted the following information relevant to the instant motion:

- Defendant knew Crosby through their mutual interest in gambling and knew Crosby had gambling and cocaine addictions.
- Crosby looked "coked out" when he interviewed Defendant about Ms. Woodall's disappearance.
- Crosby "skimmed marijuana" from seizures made by the Ada police and traded it for cocaine.
- When Defendant was interviewed by Crosby in connection with Ms. Woodall's murder, Crosby said, "T.J., what's going on here? We got to get you out of this."
- Crosby, while a detective with the Ada Police Department, was also employed

3

as a blackjack dealer at the Chickasaw Nation Gaming Center and embezzled from that facility, was fired for the embezzlement, and then arrested the Chickasaw Nation Governor's son in retaliation.

- Defendant thought someone powerful must be supporting Crosby for him to be able to keep his position as captain of detectives notwithstanding his drug, gambling, and embezzlement activities.

- When Defendant was arrested, he "expected to get the 'Ada Treatment' or beatings in the basement of the Ada police department, especially since [Ms. Woodall] formerly dated an Ada police officer."

- Defendant would be concerned for his life while in the custody of the Pontotoc County Sherriff's Office if they knew he was talking to law enforcement agents.

- Defendant had shared a cell with a person named Frank Gore, a cocaine dealer, who said he met Hood at a party and thought Hood looked like a cocaine user.

*See* Gov't's Mot. at 3; Def.'s Resp. at 1-2.  The 2003 FBI investigation was ultimately closed due to lack of evidence, *see* Gov't's Mot. at 3; however, Defendant argues that some of the allegations against Crosby were substantiated.  *See* Def.'s Resp. at 2.  For instance, Defendant states that AUSA Ryan Roberts of the Eastern District of Oklahoma, whose uncle was a Pontotoc County judge, told SA Overby that his uncle "said it was well known in Pontotoc County that Ada Oklahoma Police Officer Jeff Crosby was corrupt and a drug user." *See id.* at 3.  Additionally, Defendant represents that Hood told SA Overby that he was concerned about Crosby because of information he had learned from people in the community.  *See id*. at 3.  According to Defendant, Ada Deputy Police Chief Carl Allen told SA Overby the following:

- Deputy Chief Allen had received numerous complaints about Crosby;

- Deputy Chief Allen had received information that Crosby was stopped by police in 1995 in Highland Park, Texas, and avoided arrest by telling police he was working as an undercover drug officer;

- Deputy Chief Allen was in possession of a Seminole County Police Department report documenting that Crosby was recorded on tape by an informant disclosing

4

to drug dealers that there was a law enforcement taskforce operating in Wewoka, Oklahoma;

- Crosby was fired for embezzlement from the Chickasaw Nation Gaming Center and was almost prosecuted for "bouncing" a $4,000 check and a $5,000 check at the Seminole River Mist Casino;

- Crosby had a history of financial problems, was a heavy gambler, and was living "rent free in low income housing on Cherry Street in Ada."

*See* Def.'s Resp. at 3-4.

In discussing police corruption, Defendant also refers to several books written about notable criminal cases from the 1980s and 1990s in the Ada area. John Grisham's 2006 novel *The Innocent Man*: *Murder and Injustice in a Small Town,* which focused on the cases of Ron Williamson and Dennis Fritz and touched on the cases of Tommy Ward and Karl Fontenot, was adapted into a limited documentary series and released on Netflix in 2018. Ward and Fontenot's cases were the subject of the book *The Dreams of Ada* by Robert Mayer. That book was published in 1987 and Fontenot's conviction was overturned in 2019.

## II.    Applicable Standards

"A motion *in limine* is a request for guidance by the court regarding an evidentiary question, which the court may provide at its discretion to aid the parties in formulating trial strategy." *Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995) (internal quotation marks omitted). Generally, the proponent of a motion in limine bears the burden of proof. *See, e.g.*, *First Sav. Bank v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1082 (D. Kan. 2000); *Pinon Sun Condo. Ass'n v. Atain Specialty Ins. Co.*, No. 17-cv-01595, 2020 WL 1452166, at *3

(D. Colo. Mar. 25, 2020).   A court's in limine rulings are preliminary and "subject to change when the case unfolds."  *Luce v. United States*, 469 U.S. 38, 41 (1984).

>    III.    *The Government's Motion*

The Government seeks to exclude the following: (1) allegations of misconduct by Crosby and Hood on the grounds that such allegations are irrelevant or are inadmissible character evidence; (2) suicide as the cause of Crosby's death; and (3) hearsay statements. *See* Gov't's Mot. at 4-6.  Additionally, at the June 10, 2022 hearing, the Government argued that evidence of corruption in Pontotoc County generally, and of Crosby specifically, was inadmissible as either irrelevant, or if relevant, that such evidence's probative value is substantially outweighed by dangers of unfair prejudice or confusion of the issues.

>    A.    Relevance

Evidence is relevant if it has any tendency to make a fact of consequence more or less probable.  *Id.* R. 401(a), (b).   Relevant evidence may still be inadmissible if its probative value is substantially outweighed by the dangers articulated in Rule 403 such as unfair prejudice, confusing the issues, or misleading the jury.  *See* Fed. R. Evid. 403. "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case." *United States v. Caraway*, 534 F.3d 1290, 1301 (10th Cir. 2008) (internal quotation marks omitted).   "To be *unfairly* prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  *Id.* (emphasis in original) (quoting Fed. R. Evid. 403 advisory committee's note). "The danger of 'confusion of the issues' and 'misleading the jury' arises when circumstantial evidence would tend to sidetrack the jury into consideration of factual

6

disputes only tangentially related to the facts at issue in the current case." *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998).

### 1. Corruption in Pontotoc County

At the hearing, the Government stated that it intended to argue that Defendant's actions before, during, and after the initial altercation between Defendant and Ms. Woodall show that Defendant's killing of Ms. Woodall was premeditated. Defendant contends that evidence regarding corruption in the Pontotoc County criminal justice system is relevant to Defendant's state of mind following Ms. Woodall's killing, specifically to explain why Defendant attempted to cover up the killing. *See* Def.'s Resp. at 7. Essentially, Defendant seeks to negate that the actions he took following the killing are evidence of premeditation by explaining that he tried to cover up his crime out of fear that he would be subject to abuse and unfair treatment by these bad actors.[3]

Defendant specified that he intends to elicit testimony from Defendant, SA Overby, and other law enforcement agents about the following subjects: (1) the conviction and subsequent exoneration of Williamson and Fritz, as well as criticism of the convictions of Fontenot and Ward; (2) the conviction of Ada Deputy Police Chief Dennis Corvin of federal drug charges; and 3) physical abuse of detainees in the basement of the Ada Police Department, which Defendant referred to as "the Ada Treatment." Defendant argues that it is necessary to question these witnesses about specific instances in order to corroborate

---

[3] Defendant also suggested that this evidence is relevant to explain why Defendant pled guilty to first degree murder in 2002. The Court defers ruling on that issue until it is presented at trial.

Defendant's fear of unfair treatment and to establish that Defendant's fear was not fabricated.

i.       Williamson, Fritz, Fontenot, and Ward

Williamson and Fritz were exonerated three years before Defendant's arrest, and Defendant contends that their exoneration was a well-known event in Pontotoc County. The convictions of Fontenot and Ward were in effect at the time of Defendant's arrest (Fontenot would be exonerated in 2019), but the case against them had been criticized in *The Dreams of Ada*, which was first published in 1987.

Because Defendant is charged with first-degree murder, evidence supporting or negating premeditation—an element of that offense—speaks to a fact of consequence. *See* 18 U.S.C. § 1111(a); Fed. R. Evid. 401. Conceivably, Defendant's knowledge of the Williamson and Fritz exonerations could have caused Defendant to be fearful that he would receive unfair treatment in the Pontotoc County Criminal Justice System, especially if Defendant knew that Williamson, who was a Native American like Defendant, received the death penalty for a crime he did not commit. While Fontenot and Ward were not exonerated before Defendant's arrest, their case had been documented and the legitimacy of their convictions called into question prior to Defendant's arrest. Therefore, Defendant's belief that these defendants were treated unfairly could support Defendant's alleged fear of being treated unfairly himself if he came forward about the killing of Ms. Woodall, and that the actions taken by him after the killing were the product of fear rather than premeditation. To this limited extent, evidence about the Williamson, Fritz, Fontenot, and Ward cases—or more precisely evidence of Defendant's beliefs about those cases—

8

would have some tendency to make a fact of consequence, premeditation, less probable, and so are relevant.

The issue then becomes whether a danger articulated in Rule 403 substantially outweighs the probative value of this evidence. The Government identifies the potential dangers of admitting such evidence as unfair prejudice and confusion of the issues. While the Court is leery of the effect of an extended discussion of those case, one that would shift the focus away from what happened to Ms. Woodall to stories about other crimes and other cases, the Court finds that a limited discussion of those cases—focused on Defendant's beliefs and how they affected Defendant's actions—would be appropriate. Defendant may testify, if he so chooses, about why he engaged in certain actions after the initial altercation with Ms. Woodall if the Government offers those actions as evidence of premeditation. Further, Defendant may briefly inquire of other witnesses who may have knowledge of those cases in order to establish that Defendant's description of his concerns of unfair treatment was credible. Such testimony would likely not pose a substantial danger of unfair prejudice or confusion of the issues, especially if accompanied by an appropriate limiting instruction. *See Noland v. City of Albuquerque*, 779 F. Supp. 2d 1235, 1241 (D.N.M. 2011) ("The proper jury instructions will help ensure that this evidence will not mislead or confuse the jury.). Therefore, in accordance with the discussion above, the Court will

reserve making specific rulings on the admissibility of this evidence until the appropriate time.

### ii.     Dennis Corvin's Federal Conviction

Defendant seeks to introduce evidence regarding Ada Deputy Police Chief Dennis Corvin's conviction for federal drug crimes as further evidence of corruption in Pontotoc County and the Ada Police Department.  *See* Def.'s Mot. at 5-6.  Unlike the wrongful convictions and alleged unfair treatment of the above referenced criminal defendants, an individual officer's drug related activity does not support Defendant's fear of unfair treatment by the Ada Police Department.  There is, moreover, no indication in the record that Dennis Corvin's crimes caused Defendant to believe that the Ada Police Department would treat him harshly or unfairly.  The Court therefore concludes that Dennis Corvin's conviction does not make a fact of consequence more or less probable and accordingly is irrelevant and inadmissible.

### iii.     Physical Abuse of Detainees

Defendant seeks to introduce evidence that his actions after the initial altercation with Ms. Woodall were motivated by fear of physical abuse by members of the Ada Police Department, especially because Ms. Woodall used to date or was still dating an Ada police officer.  The Court agrees that evidence of this particular belief may speak to Defendant's state of mind when taking steps to cover up the killing and is therefore relevant.

As to whether the probative value of such evidence is outweighed by the danger of confusion of issues and unfair prejudice, the Court finds this to be a substantial concern, particularly given the overinclusive effect of general accusations of police brutality and the

prospect that disputes about the merits of those accusations that would distract from the issues in this case. Defendant may testify, if he so chooses, about why he engaged in certain actions after the initial altercation with Ms. Woodall if the Government offers those actions as evidence of premeditation. As Defendant has not specified that any other witness has knowledge of any specific instance of physical abuse by members of the Ada Police Department, the Court at this time grants the Government's objection to that subject being raised with other witnesses. Beyond that, the Court will reserve making specific rulings on the admissibility of this evidence until the appropriate time

### 2. *Crosby*

The Government requests that the Court exclude allegations of corruption by Crosby as irrelevant under Rule 401 or as unduly prejudicial under Rule 403. At the hearing, Defendant argued that Defendant's knowledge or belief that Crosby was corrupt influenced his decision not to come forward and to cover up the killing, and is therefore relevant to Defendant's state of mind during the events after the killing, tending to negate premeditation. Further, Defendant contends that evidence of specific instances of Crosby's corruption is relevant and necessary to establish that Defendant's concerns were legitimate and not fabricated.

Defendant's belief that Crosby was corrupt could tend to bolster Defendant's contention that he was afraid to report the killing of Ms. Woodall and covered up that

killing due to fear that he would be treated unfairly by the Ada Police Department.  To that limited extent, evidence about misconduct by Crosby is relevant.

As to whether the probative value of this evidence is outweighed by the danger of confusion of issues and unfair prejudice, the Court again finds this to be a substantial concern.  The scope of Defendant's allegations against Crosby is broad (drug use, gambling addiction, stealing evidence to trade for drugs, embezzlement, hot checks, retaliatory arrests, and dishonesty) and includes misconduct with little relationship to the type of unfair treatment Defendant has stated was his concern.  Such accusations would "tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case." *McVeigh*, 153 F.3d at 1191.

The Court determines that testimony by Defendant or SA Overby about Defendant's relationship with Crosby, Defendant's knowledge or belief that Crosby was corrupt, why Defendant's knowledge or belief about Crosby's corruption caused Defendant to take steps to conceal the killing rather than report it, and SA Overby's reasons for interviewing Defendant in the course of his investigation into corruption in Ada may be permissible if that testimony is narrowly tailored and sufficiently connected to Defendant's state of mind during the events after the killing.  The probative value of any evidence regarding specific instances of Crosby's corruption, however, could be outweighed by the dangers of confusing the issues and misleading the jury through extended discussion of these topics. *See Old Chief v. United States*, 519 U.S. 172, 184–85 (1997) ("[W]hen Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing

the result of that assessment alongside similar assessments of evidentiary alternatives.").

Consequently, the Court will reserve making specific rulings on the admissibility of this

evidence until the appropriate time.[4]

  B.  <u>Character Evidence</u>

  The Government contends that allegations or evidence of Crosby's corruption is

inadmissible character evidence.  *See* Gov't's Mot. at 4.  "Evidence of any other crime,

wrong, or act is not admissible to prove a person's character in order to show that on a

particular occasion the person acted in accordance with the character."  Fed.  R.  Evid.

404(b)(1).  Under Federal Rule of Evidence 404(b)(2), however, such evidence "may be

admissible for another purpose, such as proving motive, opportunity, intent, preparation,

plan, knowledge, identity, absence of mistake, or lack of accident."  *Id.* R. 404(b)(2).

  "Rule 404(b) is typically used by prosecutors seeking to rely on a criminal

defendant's prior bad acts as proof of 'motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident' in the crime charged."  *United*

*States v. Montelongo*, 420 F.3d 1169, 1174 (10th Cir. 2005) (quoting Fed. R. Evid.

404(b)(2)). "The Rule is not so limited in its application, however, and evidence of a

witness' other wrongs, acts, or crimes is admissible 'for defensive purposes if it tends,

---

[4] At the hearing defense counsel stated that he did not intend to present evidence of statements made by Frank Gore that he saw Hood at a party and that Hood looked like a cocaine user.  This appearing to be the only allegation of misconduct by Hood, the Court tentatively grants the Government's request to exclude evidence relating to allegations of corruption or misconduct by Hood.

alone or with other evidence, to negate the defendant's guilt of the crime charged against him.'" *Id.* (quoting *Agushi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999)).

Defendant has stated that he seeks to offer evidence of Crosby's misconduct for the limited purpose of establishing its effect on Defendant's state of mind. *See* Def.'s Resp. at 7. Defendant specifically states that he does not seek to introduce evidence of Crosby's misconduct to establish that the investigation of Defendant was flawed. Accordingly, because evidence relating to Crosby's misconduct is not being offered as propensity evidence, the evidence is not barred by Rule 404(b)(1) and is admissible for "another purpose" under 404(b)(2).

C.      Hearsay

The Government requests that Defendant be prohibited from introducing hearsay statements. *See* Gov.'t Mot. at 5. The Government has not identified specific statements to which it objects but counsel did argue at the hearing that its concern is primarily statements by Defendant to SA Overby and Defendant's sister. Defendant responds that the statements he intends to offer are either not to be offered for the truth of the matter asserted or are admissible under hearsay exception Rule 803(3)—then existing state of mind. *See* Def.'s Resp. at 7-8.

Without knowing the specific statements at issue, the context in which the statements were made, and Defendant's purpose for offering the statements, the Court cannot determine whether any of the statements are hearsay, non-hearsay, or otherwise

14

admissible under an exception or exemption.  The Court will therefore reserve ruling on

the Government's hearsay objections until the appropriate time.

> D.      Crosby's Cause of Death

The Government requests that Defendant be prohibited from mentioning Crosby's

suspected cause of death—suicide—to the jury.  *See* Def's Mot. at 5.  Defense counsel

represented at the hearing that he did not intend to raise this subject.  Based on Defendant's

representations, the Government's request is granted.

CONCLUSION

Accordingly, the Government's Motion in Limine (Doc. No. 124) is GRANTED

IN PART and DENIED IN PART as explained above.

IT IS SO ORDERED this 27th day of June, 2022.

CHARLES B. GOODWIN
United States District Judge